**Volume 1 of 2**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

THERESA MARIE SQUILLACOTE, a/k/a
Tina, a/k/a Mary Teresa Miller,

No. 99-4088

a/k/a The Swan, a/k/a Margaret,
a/k/a Margit, a/k/a Margret, a/k/a
Margrit, a/k/a Lisa Martin, a/k/a
Resi, a/k/a Anne,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 99-4089

KURT ALAN STAND, a/k/a Ken, a/k/a
Junior, a/k/a Alan David Jackson,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CR-98-61)

Argued: March 3, 2000

Decided: August 11, 2000

Before LUTTIG and TRAXLER, Circuit Judges, and
Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Traxler wrote the opinion, in which Judge Luttig and Senior Judge Kiser joined.

_____

**COUNSEL**

**ARGUED:** Lawrence S. Robbins, MAYER, BROWN & PLATT, Washington, D.C., for Appellant Squillacote; Richard Alan Sauber, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, Washington, D.C., for Appellant Stand. Randy I. Bellows, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Michael Charles Liebman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Lee H. Rubin, Edward S. Lee, MAYER, BROWN & PLATT, Washington, D.C., for Appellant Squillacote; Douglas W. Baruch, David B. Wiseman, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, Washington, D.C., for Appellant Stand. Helen F. Fahey, United States Attorney, Vincent L. Gambale, Assistant United States Attorney, Robert A. Spencer, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

**OPINION**

TRAXLER, Circuit Judge:

Appellants Theresa Squillacote and her husband Kurt Stand appeal from their convictions on various espionage-related charges. We affirm.

I.

Viewed in the light most favorable to the government, the evidence presented at trial established the following. Kurt Stand's parents fled to the United States from Germany during Hitler's reign. After the war, his family maintained contact with friends in the German Democratic Republic ("East Germany"). When Stand was approximately 18, his father introduced him to Lothar Ziemer, an officer with the

Ministerium fur Staatssicherheit ("MfS"), East Germany's intelligence agency. The "HVA" was the foreign intelligence arm of the MfS, and Ziemer was in charge of Section 3 of the HVA's Department XI. The "primary mission" of Department XI was the "operational reconnaissance of North America." J.A. 726. Its purpose was to "acquire data of significance to the German Democratic Republic . . . that could not be acquired by legal means." J.A. 726. In the early 1970s, Stand began working for Ziemer as an HVA agent.

Stand's HVA activities consisted primarily of recruiting other agents. In 1976, Stand invited James Michael Clark, a college friend, to travel with him to Germany. Stand introduced Clark to an HVA operative, who introduced him to Ziemer. Ziemer invited Clark to join his organization, which he described as performing intelligence work on behalf of East Germany and other socialist countries, as well as "liberation movements" in Asia, Latin America, and Africa. J.A. 903. Clark agreed. Sometime between 1979 and 1981, Stand brought his wife Theresa Squillacote into the fold, and she too became what Ziemer described as an "informal collaborator[ ]." J.A. 703. At some point, Squillacote's relationship with Ziemer became more than professional, and they had an affair that lasted until 1996.

The HVA devoted substantial resources to the training of Stand, Squillacote, and Clark. They traveled to many countries, including East Germany and Mexico, to meet with their "handlers." They received training on detecting and avoiding surveillance, receiving and decoding messages sent by shortwave radio from Cuba, mailing and receiving packages through the use of "accommodation" addresses, using codewords and phrases, using a miniature camera to photograph documents, and removing classified markings from documents. HVA records indicate that the three conspirators were together paid more than $40,000 between 1985 and 1989, primarily as reimbursement for travel expenses.

As part of his "operational plan" devised with Ziemer, J.A. 925, Clark moved to Washington, D.C., and obtained a master's degree in Russian. For a time Clark worked for a private company in a position that required him to obtain a security clearance. He later obtained a position with the United States Army, in its environmental law division, which also required a security clearance. Clark had friends who

3

worked for the State Department, and through them he obtained numerous classified documents that he turned over to the HVA.

Squillacote and Stand also moved to Washington, D.C., and she went to law school at the HVA's suggestion. Squillacote first followed in her father's footsteps by becoming an attorney for the National Labor Relations Board. When she realized that she had taken a career path that was not "in the best direction," J.A. 2213, she began trying to "move [her] professional work more in line with the commitments that [she] had made." J.A. 1682. To that end, Squillacote used her father's connections to obtain an unprecedented temporary detail from the NLRB to the House Armed Services Committee. In 1991, Squillacote obtained a permanent job as an attorney in the Department of Defense, eventually becoming the Director of Legislative Affairs in the Office of the Undersecretary of Defense (Acquisition Reform), a position that required a security clearance and provided access to valuable information. During her tenure with the federal government, Squillacote applied for numerous government jobs, including positions with the Central Intelligence Agency, the National Security Agency, United States Army, Navy, and Air Force, and the Departments of State, Commerce, Energy, and Treasury. Apparently it was not until she began working for the Department of Defense that Squillacote gained access to the kind of information sought by her handlers.[1] However, by that time, East Germany had collapsed.

After the fall of the Berlin Wall, Ziemer began working with the KGB, the Soviet Union's intelligence agency. Ziemer maintained his relationships with Stand, Squillacote, and Clark during this time, and they, too, became involved with the KGB. Stand, Squillacote, and Clark each traveled overseas to meet with Ziemer during the period after the collapse of East Germany. Ziemer instructed the conspirators to purchase Casio digital diaries with interchangeable memory cards. The conspirators, Ziemer, and their KGB contacts communicated with each other by exchanging memory cards.

_____

[1] The government's evidence established that it was not unusual for the HVA to recruit agents and then, "over the course of years, . . . seek to install [the agent] into a sector where [the agent] will be of use." J.A. 718.

In April 1992, Ziemer and another former HVA official were arrested and ultimately convicted for their post-unification intelligence activities with the KGB. Stand, Squillacote, and Clark became understandably concerned about their personal safety after Ziemer's arrest. They knew that "western services" were looking for two men and one woman operating out of Washington, D.C., and that the western services were aware of code names they had used. J.A. 2240. However, they believed that Ziemer and other former HVA officials would not compromise their identities. When Ziemer was released from prison in September 1992, Stand, Squillacote, and Clark re-established a system of communication with him, one purpose of which was to keep everyone informed about any threats to their safety.

From the beginning of their involvement with the HVA, Stand, Squillacote, and Clark operated independently of each other and generally were unaware of the others' activities. After Ziemer's arrest in 1992, however, the three began talking in detail about their activities and precautions needed to maintain their security. They began discussing the possibility of future intelligence work, perhaps for Vietnam or Cuba. Squillacote also talked to Clark about her interest in South Africa's Communist Party.

In 1994, Squillacote, as part of her search for "another connection," J.A. 2290, went to Amsterdam to speak to David Truong, whom she had met in college. Truong, who had been convicted of espionage on behalf of North Vietnam, was intrigued, but took no further action.

In 1995, Squillacote went to great lengths to obtain a post office box under the name of "Lisa Martin." In June 1995, Squillacote, as Lisa Martin, sent a letter to Ronnie Kasrils, the Deputy Defense Minister of South Africa. Kasrils was a Communist party official, and had received training in East Germany, the Soviet Union, and Cuba. The letter, which took Squillacote months to write, was primarily devoted to Squillacote's explanation for the collapse of socialism that began with the fall of the Berlin Wall, and her views on how the communist movement should proceed in the future. The letter was an attempt by Squillacote to make a connection with Kasrils, whom Squillacote hoped would "read between the lines." J.A. 1912. Stand and Clark

were aware of the letter, but Clark apparently doubted its effectiveness.

In February 1996, Squillacote received a Christmas card from Kasrils addressed to L. Martin. In the card, Kasrils thanked "Lisa" for "the best letter" he had received in 1995. J.A. 1675. Stand and Squillacote were thrilled they received the note, and they began to think that perhaps a connection could be made. In September 1996, Squillacote found another letter from Kasrils in her Lisa Martin post office box. The letter stated that "you may have the interest and vision to assist in our struggle," and invited Squillacote to a meeting in New York City with a representative of "our special components." J.A. 1681.

Squillacote and Stand, however, were unaware that, for many years, they had been the subjects of an intense FBI investigation. As part of its investigation, the FBI in January 1996 obtained authorization to conduct clandestine electronic surveillance, which included the monitoring of all conversations in the Appellants' home, as well as calls made to and from their home and Squillacote's office. Through its investigation, the FBI had learned of Squillacote's letter to Kasrils and the Appellants' response to the February 1996 note from Kasrils. The September 1996 Kasrils letter in fact was written by the FBI as part of a "false flag" operation intended to uncover information about the prior espionage activities of Stand, Squillacote, and Clark.

When designing the false flag operation, the FBI's Behavioral Analysis Program Team prepared a report "to examine the personality of [Squillacote] . . ., and based on this examination, to provide suggestions . . . that could be used in furthering the objective of this investigation--to obtain evidence regarding the subject's espionage activity." J.A. 2057. The report (the "BAP report") was based on information the FBI had learned during its extensive investigation and surveillance of the Appellants.

The BAP report traced Squillacote's family background, including the suicide of her older sister and her mother's history of depression. The report stated that Squillacote was suffering from depression and listed the anti-depressant medications she was taking. The primary focus of the BAP report, however, was Squillacote's emotional

6

makeup and how to tailor the approach to her emotional characteristics.

The report described Squillacote as having "a cluster of personality characteristics often loosely referred to as `emotional and dramatic,'" J.A. 2060, and recommended taking advantage of Squillacote's "emotional vulnerability" during her period of grieving over the then-recent end of her affair with Ziemer, using an undercover agent "who possesses the same qualities of dedication and professionalism as her last contact," and structuring the undercover agent's "pitch" to mirror her relationship with Ziemer. J.A. 2061. The BAP report also made very specific recommendations about how the false flag operation should be designed:

> The following scenario has been developed upon an analysis of the subject's personality, and includes suggestions designed to exploit her narcissistic and histrionic characteristics. It is believed that [Squillacote] will be susceptible to an approach through her mail drop based on her recent rejection by her long-term German handler, and her thrill at receiving a Christmas card from the South African official.

J.A. 2064. The report suggested the use of a letter from "the object of [Squillacote's] adulation in South Africa." J.A. 2064. It recommended that the letter instruct Squillacote to travel a circuitous route to the location of the first meeting to "add a sense of excitement and intrigue to the scenario." J.A. 2064. The report recommended the use of a mature male undercover agent, who should "capitalize on [Squillacote's] fantasies and intrigue" by making a "friendly overture," and "act[ing] professional and somewhat aloof yet responsive to her moods. The initial meet should be brief and leave[Squillacote] beguiled and craving more attention." J.A. 2065.

The false flag letter received by Squillacote in September 1996 served its intended purpose. Unaware of any FBI involvement, Squillacote and Stand were thrilled about the letter, and Squillacote began enthusiastically making plans for a trip to New York City to meet the South African emissary.

In October 1996, Squillacote met with an undercover FBI agent posing as a South African intelligence officer. She had face-to-face

7

meetings with the agent a total of four times, including one meeting where she brought Stand and her two children. Several letters were also exchanged, including a letter that Squillacote wrote at the request of the undercover agent describing her previous activities with Ziemer. In these meetings and letters, Squillacote expressed her enthusiasm for her new South African connection and her hope for a productive collaboration.

Throughout her association with the undercover agent, Squillacote discussed the possibility of bringing Ziemer and other former East German contacts into the operation. In December 1996, she contacted Ziemer to see if he was interested in the operation. According to Squillacote, Ziemer's response was "[y]es, yes, yes, yes, yes!" J.A. 1939.

At the second meeting with the undercover agent on January 5, 1997, Squillacote presented the agent with four classified documents she had obtained from the Department of Defense. Although the agent had never requested any documents or classified information from Squillacote, she explained that one day when she and her secretary were alone in her office, she decided to "score what [she] could score." J.A. 509. In fact, she had obtained one of the documents even before her <u>first</u> meeting with the undercover agent. The documents Squillacote gave to the undercover agent were: (1)"Defense Planning Guidance for Fiscal Year 1997 through 2001," J.A. 499, a numbered document, classified "secret," with restricted dissemination; (2) "Defense Planning Guidance Scenario Appendix" for 1998 through 2003, J.A. 501, a numbered document classified at the"secret" level, which forbade reproduction or further dissemination without authorization; (3) "Defense Planning Guidance, Fiscal Years 1996 through 2001, Final For Comment Draft," J.A. 504, which was classified "secret," with restricted dissemination; and (4) an untitled CIA intelligence report classified "secret," with restricted dissemination. Three of the documents Squillacote gave to the undercover agent were copies; the "Scenario Appendix" was an original that Squillacote said would not be missed. These documents formed the basis of the charges against Squillacote and Stand.

Shortly after this meeting, Squillacote quit her job with the Department of Defense, a political maneuver she hoped would put her in

8

position for a more prestigious job.[2] Nonetheless, Squillacote continued meeting and corresponding with the undercover agent for several more months, until she and Stand were arrested in October 1997. A search of their home uncovered a wealth of incriminating evidence, including a miniature camera, a Casio digital diary and memory cards, and an extra copy of two of the documents given to the undercover agent.

Clark eventually pleaded guilty to a single charge of conspiring to commit espionage, and he testified for the government at the trial of Squillacote and Stand. At trial, the government introduced certain HVA records, including "true name" cards showing the names and addresses of Stand, Squillacote, and Clark, as well as documents listing some of their code names and the names of the operations to which they were assigned. The HVA records listed Squillacote as a "[d]evelopmental agent" whose target was the "U.S. central government" and described Squillacote as trustworthy. J.A. 2028. The records described Stand as reliable, and listed him as a "[s]ource with direct access," with a target of "U.S. union/organization, direct/upper level, IBFG union, U.S.A." J.A. 2034. Clark was listed as a "[s]ource with direct access," whose activities were targeted against the "Defense Ministry NATO Country FRG USA." J.A. 2010. The records also described Clark as reliable. Other than the four documents passed to the undercover agent, the government presented no evidence establishing that Squillacote or Stand had previously supplied classified documents or information to Ziemer or anyone else.

Squillacote and Stand were convicted of conspiracy to transmit information relating to the national defense, see 18 U.S.C.A. § 794(a) and (c) (West 2000); attempted transmission of national defense

_____

[2] However, Squillacote explained to the undercover agent that her involvement in the political maneuvering and her decision to quit were primarily motivated by her "joint efforts" with the undercover agent. Squillacote believed that her former Department of Defense boss might be named Deputy Secretary of Defense and that she would be able to follow her former employer back into the Department. Squillacote described this scenario as "the big time," noting that if it worked out, there would be a "straight f---ing line," J.A. 515, presumably to the Secretary of Defense. This scenario never came to pass.

information, see 18 U.S.C.A. § 794(a); and obtaining national defense information. See 18 U.S.C.A. § 793(b) (West 2000).**3** Squillacote was also convicted of making false statements. See 18 U.S.C.A. § 1001 (West 2000).

Squillacote and Stand appeal, raising numerous issues arising during the course of the prosecution. We address each issue, although not in the order presented by the Appellants.

II.

The Appellants filed several pre-trial motions to suppress various portions of the government's evidence. The district court denied each of the motions, and the Appellants challenge those rulings on appeal.

A.

The government conducted 550 consecutive days of clandestine surveillance of the Appellants, surveillance that was authorized under the Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C.A. § 1801 - 1811 (West 1991 & Supp. 2000). FISA was enacted "to put to rest a troubling constitutional issue" regarding the President's "inherent power to conduct warrantless electronic surveillance in order to gather foreign intelligence in the interests of national security," ACLU Found. of Southern California v. Barr, 952 F.2d 457, 460 (D.C. Cir. 1991), a question that had not been definitively answered by the Supreme Court. See id. at 461. "FISA thus created a `secure framework by which the Executive Branch may conduct legitimate electronic surveillance for foreign intelligence purposes within the context of this Nation's commitment to privacy and individual rights.'" Id. (quoting S. Rep. No. 604, pt. 1, 95th Cong., 1st Sess. 15 (1977), reprinted in 1978 U.S.C.C.A.N. 3904, 3916)).

FISA established a special court, composed of seven federal district court judges appointed by the Chief Justice, which reviews applica-

_____

**3** As to each of these counts, the indictment also alleged violations of 18 U.S.C.A. § 2(a) (West 2000), which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

tions for authorization of electronic surveillance aimed at obtaining foreign intelligence information. See 50 U.S.C.A. § 1803. "With several exceptions not here relevant, electronic surveillance of a foreign power or its agents may not be conducted unless the FISA Court authorizes it in advance." ACLU of Southern California, 952 F.2d at 461.

Each application to the FISA court must first be personally approved by the Attorney General. See 50 U.S.C.A. § 1804(a). The application must contain, among other things,

> a statement of reasons to believe that the target of the surveillance is a foreign power or agent of a foreign power, specified information on the implementation of the surveillance, and a "certification" from a high-ranking executive branch official stating that the official "deems the information sought to be foreign intelligence information" and that the information sought cannot be obtained by other means.

United States v. Pelton, 835 F.2d 1067, 1075 (4th Cir. 1987); see 50 U.S.C.A. § 1804(a)(7). Where the target of the surveillance is a "United States person,"[4] the FISA court may issue an order authorizing the surveillance only if the FISA judge concludes that there is "probable cause to believe that the target of the surveillance is a foreign power or agent of a foreign power, that proposed `minimization procedures' are sufficient under the terms of the statute, that the certifications required by § 1804 have been made, and . . . that the certifications are not `clearly erroneous.'" Pelton, 835 F.2d at 1075; see 50 U.S.C.A. § 1805(a) (setting forth the findings necessary to support the issuance of an order authorizing surveillance).

_____

[4] See 50 U.S.C.A. § 1801(i) ("`United States person' means a citizen of the United States, an alien lawfully admitted for permanent residence . . ., an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power . . . .").

11

Prior to trial, the Appellants sought to suppress the fruits of the FISA surveillance. They attacked the validity of the surveillance on several grounds, all of which were rejected by the district court. On appeal, however, the Appellants press only one FISA-related issue: They contend that the surveillance was improper because there was no probable cause to believe that Squillacote or Stand were agents of a foreign power. We disagree.

Under FISA, an agent of a foreign power is any person who "knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States." 50 U.S.C.A. § 1801(b)(2)(A). One who knowingly aids and abets another engaging in such clandestine intelligence activities, or one who knowingly conspires with another to engage in the clandestine intelligence activities, is also considered an agent of a foreign power. See 50 U.S.C.A. § 1801(b)(2)(D). A "United States person" may not be determined to be an agent of a foreign power "solely upon the basis of activities protected by the first amendment to the Constitution of the United States." 50 U.S.C.A. § 1805(a)(3)(A).

FISA provides that the district court must review in camera and ex parte the FISA application and other materials necessary to rule upon a defendant's suppression motion "if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States." 50 U.S.C.A. § 1806(f). Because the Attorney General filed such an affidavit in this case, the district court reviewed the applications and other materials in camera, and the documents were not disclosed to counsel for the Appellants. See 50 U.S.C.A. § 1806(f) (The district court "may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.").

After reviewing the applications, the district court concluded that each of the more than 20 FISA applications established probable cause to believe that the Appellants were agents of a foreign power. We have reviewed de novo the relevant materials, and likewise con-

12

clude that each FISA application established probable cause to believe that Squillacote and Stand were agents of a foreign power at the time the applications were granted, notwithstanding the fact that East Germany was no longer in existence when the applications were granted. See 50 U.S.C.A. § 1801(a) (defining "foreign power"); 50 U.S.C.A. § 1801(b) (defining "agent of a foreign power"). We are also satisfied that the Appellants were not targeted solely because of any protected First Amendment activities in which they may have engaged. Given the sensitive nature of the information upon which we have relied in making this determination and the Attorney General's conclusion that disclosure of the underlying information would harm the national security, it would be improper to elaborate further. See United States v. Isa, 923 F.2d 1300, 1304 (8th Cir. 1991) (finding probable cause to authorize FISA surveillance and declining to comment further on the probable cause issue where the Attorney General filed an affidavit and claim of privilege).

Accordingly, we reject the Appellants' contention that the FISA surveillance was illegal. In addition, because the documents submitted by the government were sufficient for the district court and this Court to determine the legality of the surveillance, we also deny the Appellants' request for disclosure of the FISA materials. See United States v. Belfield, 692 F.2d 141, 147 (D.C. Cir. 1982) ("The language of section 1806(f) clearly anticipates that an ex parte, in camera determination is to be the rule. Disclosure and an adversary hearing are the exception, occurring only when necessary.").

B.

The Appellants also sought to suppress the evidence obtained during the search of their home, including the miniature camera, the digital diary and memory cards, a doll with a roll of miniature film hidden inside, and copies of two of the documents Squillacote passed to the undercover agent. The Appellants contend that the search was conducted in flagrant disregard of the express terms of the warrant, and that the district court therefore erred in denying their suppression motion.

The warrant authorizing the search of the Appellants' home stated that the government was to search the residence "on or before October

13

10, 1997 (not to exceed ten days) . . ., serving this warrant and making the search [ ]in the daytime--6:00 A.M. to 10:00 P.M." J.A. 330.**5** The search extended over six days, with two FBI agents remaining at the house each night. It is the presence of the FBI agents in the home after 10:00 p.m. that forms the basis of the Appellants' suppression arguments.

(1)

The Appellants first contend that, by remaining inside the Appellants' home overnight for five consecutive nights, the FBI searched the home at night, thus flagrantly disregarding the warrant's time restriction. We are wholly unpersuaded by this argument.

Preliminarily, we reject the main premise of the Appellants' challenge to the search: that the presence of the agents in the house, in and of itself, constitutes a search that should be considered separate and distinct from the authorized search of the residence. The cases upon which the Appellants rely for this proposition--Segura v. United States, 468 U.S. 796 (1984), and United States v. Jacobsen, 466 U.S. 109 (1984)--involved questions about the nature and propriety of law enforcement conduct that occurred without a warrant. See Segura, 468 U.S. at 799-801; Jacobsen, 466 U.S. at 111-12.**6** Thus, a determination of whether the conduct amounted to a search or seizure in those cases was a necessary predicate to the resolution of the Fourth Amendment claims raised. In this case, there is simply no doubt that the government searched the Appellants' home and seized an abundance of incriminating evidence. The search and seizure, however, were authorized by a warrant, the validity of which the

---

**5** See Fed. R. Crim. P. 41(c)(1) (A search warrant "shall be served in the daytime, unless the issuing authority . . . authorizes its execution at times other than daytime."); Fed. R. Crim. P. 41(h) (defining "daytime" as "the hours from 6:00 a.m. to 10:00 p.m.").

**6** We note that the Supreme Court has recently granted certiorari in Illinois v. McArthur, 713 N.E.2d 93 (Ill. App. Ct. 1999), to determine whether the police may secure a residence from the outside, and prohibit the defendant from entering the house unless accompanied by a police officer, for approximately two hours while awaiting a search warrant. See Illinois v. McArthur, 120 S. Ct. 1830 (2000).

14

Appellants do not challenge. Where a search is authorized by a warrant, we believe it unnecessary and improper to isolate certain conduct occurring during the execution of the warrant and treat that conduct as a separate and discrete search. Instead, the government's actions while executing a warrant must be considered in context, and the question that must be answered is whether the government exceeded the scope of the warrant. See, e.g., Walter v. United States, 447 U.S. 649, 656 (1980) (plurality opinion) ("When an official search is properly authorized--whether by consent or by the issuance of a valid warrant--the scope of the search is limited by the terms of its authorization."). We first conclude that the government did not exceed the scope of the warrant. Second, we conclude that even if the government did exceed the scope of the warrant, blanket suppression of all evidence seized would not be required.

(a)

Distilled to its essence, the Appellants' "flagrant disregard" argument is this: (1) The warrant authorized searching the residence only between the hours of 6:00 a.m. and 10:00 p.m.; (2) government agents remained inside the residence between 10:00 p.m. and 6:00 a.m.; (3) ipso facto, the government flagrantly disregarded the terms of the warrant. The validity of this argument, however, is largely dependent upon the Appellants' assumption that the mere presence of the agents in the house amounted to a search, an assumption we have already rejected. And without this assumption, the argument fails, as we discuss below.

When denying the Appellants' motion to suppress, the district court found that the government complied with the warrant by conducting the search "during the hours that were set out in the warrant." J.A. 415. This conclusion is supported by the affidavit of Special Agent Gregory Leylegian, an FBI agent who took part in the search. Leylegian's affidavit stated that the FBI "conducted no searching of the premises after 10:00 p.m. each day" and that"[t]he FBI maintained two agents on the premises each night to preserve the integrity of the search process, to expedite the completion of the search, and to maintain security of the premises to prevent the removal or destruction of evidence." J.A. 360. Because the district court's factual determination of the conduct actually engaged in by the FBI agents is supported by

15

the evidence presented at the suppression hearing and is not implausible, the standard of review governing this issue dictates that we accept that conclusion. See United States v. Lattimore , 87 F.3d 647, 651 (4th Cir. 1996) (en banc) (A district court's factual determination is clearly erroneous if "it can be said that the view of the evidence taken by the district court is implausible in light of the entire record."). The warrant provided only that the search must be conducted between the hours of 6:00 a.m. and 10:00 p.m.; it did not expressly prohibit the presence of non-searching agents in the house after 10:00 p.m. Because the FBI did not search during the hours prohibited by the warrant, we therefore conclude that the FBI did not exceed the scope of the warrant by remaining in the house overnight.

(b)

Nonetheless, even if we were to conclude that the FBI exceeded the scope of the warrant, we still would not conclude that the government's actions required suppression of all the evidence seized during the search. As a general rule, if officers executing a search warrant exceed the scope of the warrant, only the improperly-seized evidence will be suppressed; the properly-seized evidence remains admissible. See United States v. Jones, 31 F.3d 1304, 1314 (4th Cir. 1994); see also Horton v. California, 496 U.S. 128, 140 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more. Thus, in the case of a search incident to a lawful arrest, if the police stray outside the scope of an authorized . . . search they are already in violation of the Fourth Amendment, and evidence so seized will be excluded . . . ." (emphasis added) (alteration and internal quotation marks omitted)). However, "[i]n extreme circumstances even properly seized evidence may be excluded when the officers executing the warrant exhibit a flagrant disregard for its terms." United States v. Ruhe, 191 F.3d 376, 383 (4th Cir. 1999) (internal quotation marks omitted).

The extraordinary remedy of blanket suppression of all evidence seized "should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search." United States v. Chen, 979

16

F.2d 714, 717 (9th Cir. 1992); accord United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir. 1988). Thus, in the few cases where blanket suppression has been ordered, most involved the seizure by law enforcement officials of large quantities of evidence clearly not within the scope of the warrant. See United States v. Foster, 100 F.3d 846, 848 (10th Cir. 1996); Medlin, 842 F.2d at 1196, 1199; United States v. Rettig, 589 F.2d 418, 420-21 (9th Cir. 1978).

In this case, however, the Appellants do not contend that any of the evidence seized by the government was beyond the scope of the warrant or that, by remaining in the house after 10:00 p.m., the government impermissibly converted the warrant into a general warrant. Instead, the Appellants complain only about the manner by which the government executed the warrant, a complaint that is inadequate to justify the severe remedy of blanket suppression.

First, we note that when a warrant authorizes only a daytime search, some courts have held that there is no violation of the terms of the warrant if the search is commenced in the daytime, even if it continues into the night. See, e.g., United States v. Young, 877 F.2d 1099, 1104-05 (1st Cir. 1989); United States v. Burgard, 551 F.2d 190, 193 (8th Cir. 1977); United States v. Joseph, 278 F.2d 504, 505 (3rd Cir. 1960) (per curiam). Because the search of the Appellants' home was commenced in the daytime, as required by the warrant, the FBI agents reasonably could have believed (if their actions after 10:00 p.m. could be considered a search) that it was proper to continue the search into the night. Second, the FBI reasonably could have concluded that it was proper to station agents inside the house after the search was suspended each evening in order to guard against the possible destruction of evidence. Cf. United States v. Gagnon, 635 F.2d 766, 769 (10th Cir. 1980) (concluding that when agents executing a search warrant discovered more marijuana than they could transport, the agents were responsible for preserving the evidence, and properly remained on the scene overnight and resumed the search the next day, when a truck arrived that could carry away the drugs). The reasonableness of the agents' conduct makes it difficult to conclude that they flagrantly disregarded the terms of the warrant.

Under these circumstances, even if the FBI's actions amounted to technical violations of the terms of the warrant, the violations were

17

relatively minor and were "motivated by considerations of practicality rather than by a desire to engage in indiscriminate`fishing.'" <u>United States v. Tamura</u>, 694 F.2d 591, 597 (9th Cir. 1982). Thus, any violations are wholly insufficient to require blanket suppression of all the evidence seized under the warrant.

(2)

In a last-ditch effort to invalidate the search, the Appellants contend that if the government did in fact stop searching each night at 10:00, then the evidence must still be suppressed because the government did not obtain a new warrant for each successive day of searching. Again we disagree.

It is beyond dispute that FBI agents entered the Appellants' home on six consecutive days to search for evidence. However, given the number and type of items that can be evidence of espionage-related activities, the search was necessarily extensive and exhaustive. <u>See United States v. Wuagneux</u>, 683 F.2d 1343, 1352 11th Cir. 1982) ("[T]he magnitude of a search is insufficient, by itself, to establish a constitutional violation; rather, the relevant inquiry is whether the search and seizures were reasonable under all the circumstances. . . . [G]iven the complexity of the crimes under investigation and the fact that they would be detected primarily if not exclusively through analysis and synthesis of a large number of documents, a rather extensive search could reasonably be expected.").

As Agent Leylegian explained in his affidavit, a"search for evidence of espionage . . . requires extreme thoroughness in order to discover the covert instruments, communications, and records of the illegal activity." J.A. 358. In addition, the search was complicated by the condition of the home. According to Leylegian,"[t]he house was extremely cluttered, and the [Appellants'] personal possessions and documents were of such quantity and in such a state of disarray as to create a great obstacle to the execution of the warrant." J.A. 359. The search was further complicated because the house was undergoing renovations, which increased the clutter and made it difficult to search certain areas of the house. Leylegian also explained that the agents were unable to search the basement, where many items were located, "for long stretches of time due to the irritation caused by an immense

18

amount of dust and the odor of cat urine." J.A. 360. Therefore, not-withstanding the large number of agents involved in the search, it is apparent that the search could not have been completed in a single day. Under these circumstances, the subsequent entries were not sepa-rate searches requiring separate warrants, but instead were simply rea-sonable continuations of the original search. The government, therefore, was not required to obtain additional warrants for each day that the search continued. See United States v. Kaplan, 895 F.2d 618, 623 (9th Cir. 1990) (concluding that second search conducted two hours after first search was a proper continuation of the first search); United States v. Carter, 854 F.2d 1102, 1107 (8th Cir. 1988) (uphold-ing under a single warrant a second search occurring several hours after initial search: "The authority of the warrant had not expired and therefore the return search was not beyond the scope of the Fourth Amendment."); United States v. Bowling, 351 F.2d 236, 241 (6th Cir. 1965) (upholding entries on successive days pursuant to a single war-rant); see also United States v. Gerber, 994 F.2d 1556, 1558-60 (11th Cir. 1993) (reversing the suppression of evidence found on Monday during search under the hood of a car even though warrant authoriz-ing the search of the car expired on the previous Friday).

Although this search may well have extended over a substantially longer period of time, the length of the search was a function only of the nature of the evidence sought and the condition of the home. To require the government to obtain a new search warrant for each con-tinued day of searching would impose an undue burden on the gov-ernment's efforts to investigate complex crimes, a burden that would be unjustifiable under the circumstances of this case. See United States v. Sakyi, 160 F.3d 164, 167 (4th Cir. 1998) ("The touchstone of our analysis under the Fourth Amendment is always the reason-ableness in all the circumstances of the particular governmental inva-sion of a citizen's personal security. Reasonableness is determined by weighing the public interest against the individual's right to personal security free from arbitrary interference by law officers." (citations and internal quotations omitted)). Accordingly, we conclude that the district court properly denied the Appellants' motion to suppress the evidence obtained during the search of their house.

19

C.

During the FISA-authorized surveillance of the Appellants, the government intercepted several telephone calls between Squillacote and her psychotherapists. Only the first two of these conversations, however, were listened to or transcribed by the government.[7] Once the supervising FBI agent learned of the conversations, she instructed the agent responsible for transcribing and indexing the conversations not to listen to, index, or transcribe any other conversations between Squillacote and her therapists.

The Appellants moved to suppress any evidence derived from the privileged communications, and requested a hearing to require the government to prove that the evidence it would present at trial was derived from sources independent of the privileged communications. The district court refused to hold the hearing, concluding that such a hearing was required only when a constitutionally-based privilege was at issue.

On appeal, the Appellants contend that the FBI employee who listened to and transcribed the conversations between Squillacote and her therapists was involved in the preparation of Squillacote's BAP report, and that privileged information was therefore used to formulate the false flag operation that led to the arrest of the Appellants. The Appellants contend that any evidence derived from the privileged information should have been suppressed and that they were entitled to a hearing to vindicate the principles set forth by the Supreme Court in Kastigar v. United States, 406 U.S. 441 (1972). We, however, conclude that Kastigar simply is not applicable to this case.

In Kastigar, the issue was whether a witness who asserts his Fifth Amendment privilege against self-incrimination may be compelled to testify "by granting immunity from the use of compelled testimony

_____

[7] Actually, one of these conversations was between Stand and one of Squillacote's therapists. Because Squillacote gave the therapist permission to talk to Stand, we will assume for purposes of this discussion that the conversation was privileged, and, in the interest of convenience, we refer to both conversations as having taken place between Squillacote and her therapists.

and evidence derived therefrom (`use and derivative use' immunity), or whether it is necessary to grant immunity from prosecution for offenses to which compelled testimony relates (`transactional' immunity)." Id. at 443. The Court concluded that a grant of "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." Id. at 453. The Court noted that if a witness who has been granted use and derivative use immunity is subsequently prosecuted, the prosecutors bear"`the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.'" Id. at 460 (quoting Murphy v. Waterfront Comm'n of New York Harbor, 378 U.S. 52, 79 n.18 (1964)). The Court further explained that "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an `investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." Id. at 460 (footnote omitted).

We agree with the Appellants that Squillacote's conversations with her psychotherapists are privileged. See Jaffee v. Redmond, 518 U.S. 1, 15 (1996) ("[W]e hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence."). The question, then, is whether the mere existence of this privileged information brings to bear the full weight of Kastigar, as Appellants apparently contend.

Contrary to the Appellants' view, a Kastigar analysis is not triggered by the existence of evidence protected by a privilege, but instead by the government's effort to compel a witness to testify over the witness's claim of privilege. See United States v. Hubbell, ___ S. Ct. ___, ___, 2000 WL 712810, *6 (2000) (stating that Kastigar "particularly emphasized the critical importance of protection against a future prosecution based on knowledge and sources of information obtained from the compelled testimony" (emphasis added) (internal quotation marks omitted)); United States v. McHan, 101 F.3d 1027, 1035 (4th Cir. 1996) ("Whether the oral use-immunity agreement at issue in this case is subject to the full Kastigar protections is doubtful because McHan voluntarily cooperated with the government.");

21

United States v. Eliason, 3 F.3d 1149, 1152 (7th Cir. 1993) (Under Kastigar, "if a defendant is able to establish through relevant evidence that he gave compelled testimony in a court proceeding based upon a promise of immunity, the government must come forth with evidence that the information it purports to use against the defendant came from a source independent of the defendant's immunized testimony."); United States v. Gutierrez, 696 F.2d 753, 756 n.6 (10th Cir. 1982) ("Because [the defendant], with full knowledge of her rights, voluntarily agreed to make a statement, the constitutional principles enunciated in Kastigar . . . are inapplicable to her claim."). If the privilege can be vindicated through a grant of immunity--as can, for example, the privilege against self-incrimination--then the witness may be compelled to testify if an adequate offer of immunity is made.

To this extent then, we agree with the Appellants' assertion that Kastigar-like protections may be required in cases involving testimony compelled over the assertion of a non-constitutional privilege. For example, a spouse asserting the adverse spousal testimony privilege or the marital communications privilege may be compelled to testify if the prosecutor gives an adequate promise that the information will not be used against the other spouse. See, e.g., In re Grand Jury, 111 F.3d 1083, 1087 (3rd Cir. 1997) ("[O]nce the government grants immunity that eliminates the possibility that the testimony will be used to prosecute the witness's spouse, the witness spouse may no longer invoke the testimonial privilege."); In re Grand Jury Subpoena of Ford, 756 F.2d 249, 252 (2nd Cir. 1985) (concluding that husband could be held in contempt for refusing to testify before the grand jury about actions of his wife where the prosecutor promised that "no grand jury testimony elicited from [the husband] would be used, either directly or indirectly, against [his] wife"). However, because the government's right to compel testimony in the face of a claim of privilege is the issue at the heart of Kastigar , its protections do not apply in cases where there is privileged evidence, but no compelled testimony.

Moreover, because "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public. . . has a right to every man's evidence," any such privilege "must be strictly construed." Trammel v. United States, 445 U.S. 40, 50 (1980) (ellipses in original) (citation and internal quotation marks omitted). Thus, we

22

do not believe that suppression of any evidence derived from the privileged conversations would be proper in this case, given that the privilege is a testimonial or evidentiary one, and not constitutionally-based. See United States v. Elie, 111 F.3d 1135, 1142 (4th Cir. 1997) (rejecting defendant's claim that evidence found as a result of his custodial statements made without receiving Miranda warnings should be suppressed because "the `tainted fruits' analysis applies only when a defendant's constitutional rights have been infringed").

Other circuits have rejected similar arguments under similar circumstances. For example, in United States v. Marashi, 913 F.2d 724 (9th Cir. 1990), the court concluded that the testimony of the defendant's ex-wife was not barred by the marital communications privilege, and the court therefore declined to address the defendant's argument that all evidence derived from the ex-wife's information and testimony should be suppressed. See id. at 731 n.11. The court noted, however, that "no court has ever applied the [fruit-of-the-poisonous-tree] theory to any evidentiary privilege." Id.; see also Nickel v. Hannigan, 97 F.3d 403, 409 (10th Cir. 1996) (even if testimony of attorney consulted by the defendant before the defendant was charged with a crime should have been suppressed on the basis of a breach of the attorney-client privilege, evidence obtained by the police that was derived from the attorney's information should not have been suppressed); United States v. Lefkowitz, 618 F.2d 1313, 1318 n.8 (9th Cir. 1980) ("Because we reject . . . Lefkowitz's argument that the marital privileges are somehow constitutionally grounded in, among other locations, the Fourth Amendment, we doubt that a secondary source of information obtained through information protected by the confidential marital communications privilege would in any way be `tainted.'").

Because this case does not involve the use of compelled testimony, the district court properly refused the Appellants' request for a Kastigar hearing. In addition, because the privilege at issue here is not a constitutional one, the district court properly refused to suppress any evidence arguably derived from the government's interception of the two conversations with Squillacote's therapists. **8**

_____

**8** We recognize that in United States v. White, 970 F.2d 328 (7th Cir. 1992), a case where the defendants' sixth amendment rights to counsel

23

III.

Perhaps some of the most damaging evidence introduced against the Appellants at trial were the HVA documents--the "true name" cards listing the names of the Appellants and their code names, and the "agent data sheets" showing the nature of their assignments for the HVA. The Appellants moved to prevent the introduction of these documents, but the district court denied the motion. On appeal, the Appellants contend that the documents were improperly admitted, arguing that they were not properly authenticated and that, even if authenticated, the documents were inadmissible hearsay.

A.

The Federal Rules of Civil Procedure provide that official records of a foreign country are considered properly authenticated if the records are

> attested by a person authorized to make the attestation, and accompanied by a final certification as to the genuineness of the signature and official position (i) of the attesting person, or (ii) of any foreign official whose certificate of genuineness of signature and official position relates to the attestation or is a chain of certificates of genuineness of signature and official position relating to the attestation.

Fed. R. Civ. P. 44(a)(2).[9] "A final certification may be made by a secretary of embassy or legation, consul general, vice consul, or consular

_____

were not at issue, the Seventh Circuit suggested that, had there been any government involvement in the breach of the attorney-client privilege, the proper remedy would be the suppression of the privileged evidence, as well as any derivative evidence. Id. at 336. Even assuming that suppression of derivative evidence may, under extraordinary circumstances, be required in cases involving the attorney-client privilege, such an extreme remedy is not required in this case.

[9] The procedure set forth in Rule 44(a)(2) is applicable in criminal proceedings by virtue of Rule 27 of the Federal Rules of Criminal Procedure. See Fed. R. Crim. P. 27 ("An official record . . . may be proved in the same manner as in civil actions.").

24

agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States." Id. Rule 902(3) of the Federal Rules of Evidence sets forth an essentially identical self-authentication process for the somewhat broader category of "foreign public documents" "purporting to be executed or attested in an official capacity" by a foreign official. See Fed. R. Evid. 902(3); id. advisory committee's note (Rule 902(3) "is derived from Rule 44(a)(2) of the Rules of Civil Procedure but is broader in applying to public documents rather than being limited to public records.").

In this case, the government presented a certification from Dirk Dorrenberg, the director of the counterespionage and protective security department of the Bundesamt fur Verfassungsschutz, the counter-intelligence service for the unified Federal Republic of Germany ("FRG"). In his certification Dorrenberg stated that the FRG is the legal successor to East Germany and that he had the "authority to make this certification by virtue of [his] official position and area of expertise." J.A. 1982. Dorrenberg stated that he had compared the HVA documents introduced by the government to "actual duplicates" of the original records, and he certified that the government's copies were "true and correct copies" of "genuine and authentic records" of the HVA. J.A. 1983-84. Dorrenberg also certified that the signature of Lothar Ziemer appearing on some of the records was "genuine and authentic." J.A. 1984. The government also presented a final certification from Manfred Bless, an FRG representative "assigned and accredited to the United States as a Counselor, Political Section, of the Embassy of the Federal Republic of Germany, in Washington, D.C." J.A. 1980. In this final certification, Bless certified that Dorrenberg held the position claimed in the Dorrenberg certification and that Dorrenberg was authorized to make the certification.

These certifications comply in all respects with the requirements of Rule 44(a)(2) and Rule 902(3). Therefore, whether the documents are considered official documents or official records, the district court quite properly concluded that the government adequately authenticated the HVA documents.

The Appellants, however, contend that the certification process of Rule 902(3) is intended to confirm the signature or attestation contained in the offered document. According to the Appellants, if the

25

document being offered into evidence does not contain a signature, a self-serving declaration of authenticity is meaningless. Thus, the Appellants contend that many of the HVA documents are not subject to self-authentication under the rules because the documents themselves are not signed or do not contain an attestation. This argument is without merit.

Nothing in Rule 44(a)(2) or in Rule 902(3) requires that the documents themselves be signed or contain an attestation within the body of the document. The rules are written in the alternative--foreign documents may be authenticated by a certification from the official executing the document <u>or</u> by an official attesting to the document. To "attest" means to "affirm to be correct, true, or genuine." <u>American Heritage College Dictionary</u> 89 (3d ed. 1997). Thus, so long as a proper official attests that the proffered document is true and genuine, it simply does not matter whether the document itself is signed or contains its own attestation.

As noted above, Rule 44(a)(2) also requires a final certification regarding the signature and position "(i) of the attesting person, or (ii) of any foreign official whose certificate of genuineness of signature and official position relates to the attestation or is in a chain of certificates of genuineness of signature and official position relating to the attestation." Fed. R. Civ. P. 44(a)(2); <u>see also</u> Fed. R. Evid. 902(3)(A) & (B). Seizing on these requirements, the Appellants contend that neither the Dorrenberg certification nor the Bless certification establish that "Dorrenberg is an official `whose certificate of genuineness of signature and official position relates to the execution or attestation' or that his certificate is in a `chain of certificates of genuineness of signature and official position relating to the execution or attestation.'" Brief of Appellants at 73. This argument is likewise without merit, as it is premised upon a fundamental misapprehension of the requirements for the authentication of foreign documents.

An examination of Rule 44(a)(2) and Rule 902(3) reveals two requirements for the authentication of a foreign document. First, there must be some indication that the <u>document</u> is what it purports to be. Thus, the proffered document must be executed by a proper official in his official capacity, or the genuineness of the document must be attested to by a proper official in his official capacity. <u>See</u> Fed. R.

26

Civ. P. 44(a)(2); Fed. R. Evid. 902(3); see also United States v. Doyle, 130 F.3d 523, 545 (2d Cir. 1997) (noting that the authentication provisions of the Rules of Evidence are not concerned with establishing the truth of information contained in proffered documents, but only with "assuring that evidence is what it purports to be"). Second, there must be some indication that the official vouching for the document is who he purports to be. Thus, the rules require that one of a specified group of foreign officials must issue a final certification attesting to the genuineness of signature and title of the person executing or attesting to the document, or of another official who has certified the signature and position of the person executing or attesting to the document. By the plain language of the rules, it is only when the genuineness of signature and position is established in the second manner described above that it is relevant whether the official is "relate[d] to" the execution or attestation or is in the "chain of certificates of signature and position." See Fed R. Civ. P. 44(a)(2); Fed. R. Evid. 902(3).

In this case, the government satisfied the first requirement of establishing that the HVA records were what they purported to be by presenting Dorrenberg's certification that the government's records were true and accurate copies of genuine HVA records. The government then established that the official vouching for the document was who he purported to be in the first manner described above--by presenting a final certification from another official establishing that it was Dorrenberg's signature on the proffered certification and that Dorrenberg was authorized to attest to the authenticity of the HVA documents. Because the government established the genuineness of signature and position of the person attesting to the documents, the portions of the rules dealing with officials related to the execution or attestation or in the chain of certifications are not applicable.

Finally, contrary to the Appellants' suggestions, the rules do not require the official attesting to the genuineness of foreign documents or records to have possession or custody of the proffered documents, to be an expert in handwriting analysis, or to have been associated with the foreign government at the time the documents were created. See Fed. R. Civ. P. 44(a)(2); Fed. R. Evid. 902(3). Accordingly, we conclude that the government properly authenticated the HVA records, whether the authentication is considered under Rule 44(a)(2)

27

of the Rules of Civil Procedure or under Rule 902(3) of the Rules of Evidence. Cf. United States v. Koziy, 728 F.2d 1314, 1322 (11th Cir. 1984) (concluding that World War II-era employment forms showing the defendant's affiliation with the Ukranian police, during a period when Russia was in control of the region, were properly authenticated under Fed. R. Evid. 902(3) where the documents were attested to by "[a] Russian official authorized to authenticate such documents").

B.

The Appellants also challenge the district court's ruling that the HVA documents were admissible as statements of a co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of Evidence. We review the district court's admission of evidence under Rule 801(d)(2)(E) for an abuse of discretion. See United States v. Blevins, 960 F.2d 1252, 1255 (4th Cir. 1992).

Evidence that would otherwise be considered hearsay may be admitted as a statement by a co-conspirator if the government establishes, by a preponderance of the evidence, "(1) that there was a conspiracy involving the declarant and the party against whom admission of the evidence is sought and (2) that the statements at issue were made during the course of and in furtherance of that conspiracy." Id.; see also Bourjaily v. United States, 483 U.S. 171, 175 (1987). In our view, the district court properly admitted the HVA records as statements by a co-conspirator.

First, the indictment specifically charged the Appellants with conspiring with, among others, "agents and officers of the GDR," J.A. 88, and the government presented ample evidence supporting that allegation, including the government's overwhelming evidence of the Appellants' relationship with Lothar Ziemer, whose signature appears on many of the disputed HVA documents. Second, although some of the documents are undated, many bear dates that are clearly within the course of the conspiracy as defined by the government's evidence. And many of the undated HVA documents show the same registration number as the dated documents and the documents bearing Ziemer's signature, thus establishing a connection between all of the HVA documents. Accordingly, the government's evidence demonstrated that the statements were made during the course of the conspiracy. Third,

28

there can be no real dispute that, by compiling the information contained in the disputed documents--the Appellants' real and code names, their addresses, the object of their assignments, how they could be contacted--the GDR was acting in furtherance of the conspiracy.

While the identity of the declarant of the unsigned documents may not be known, the only conclusion that can be drawn from the information included in the documents--information that was corroborated in many respects by Clark's testimony and by Squillacote's own statements to the undercover agent--is that the documents were created by or at the direction of East German agents who had knowledge of and were involved in the conspiracy with the Appellants. While there may be cases where the inability to identify the declarant of an alleged co-conspirator's statement could render the statement inadmissible, this is not one of those cases. The HVA documents were sufficiently connected to each other and to the conspiracy established by the government's evidence to make them reliable and admissible under Rule 801(d)(2)(E), notwithstanding the government's inability to identify the declarants. See United States v. Cruz, 910 F.2d 1072, 1081 n.10 (3d Cir. 1990) ("Unidentifiability[of the declarant] may be important in some situations, but when the statement itself and the surrounding circumstances provide sufficient evidence of reliability, unidentifiability will not be particularly important.").

We therefore conclude that the HVA records were properly authenticated and were properly admitted as statements of co-conspirators. The Appellants' complaints about the reliability of the HVA records, including the fact that the government purchased the documents from unidentified sources, merely go to the weight to be accorded the records by the jury, and not to the admissibility of the records. Cf. Koziy, 728 F.2d at 1322 (noting that the appellant's contention that Ukranian police documents were forgeries "fails to go their admissibility, but rather to the weight of the evidence").**10**

_____

**10** Another of the Appellants' complaints about the documents centers around the fact that the documents were not contained in the records of the Gauck Commission, the post-unification repository for MfS documents. The Gauck Commission, however, became the repository only of

29

IV.

Finally, the Appellants raise numerous issues in connection with the district court's instructions to the jury. Their challenges involve the district court's instructions on their entrapment defense, the court's failure to include an instruction on multiple conspiracies, and its explanation to the jury of "information relating to the national defense."

A.

The Appellants raise several issues in connection with the district court's refusal to give their entrapment instructions. There are two elements to the affirmative defense of entrapment:"government inducement and the defendant's lack of predisposition to commit the crime." United States v. Sligh, 142 F.3d 761, 762 (4th Cir. 1998); see United States v. Russell, 411 U.S. 423, 436 (1973) ("It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play."). "Where the Government has induced an individual to break the law and the defense of entrapment is at issue . . . the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." Jacobson v. United States, 503 U.S. 540, 548-49 (1992).**11**

_____

the "documents that were still there upon dissolution of the MfS, which occurred during December of 1989. The MfS had gone through several transitional phases, which resulted in a good number of documents having disappeared." J.A. 823A. That the documents were not among the Gauck Commission's records does not prevent them from being admitted at trial, but is simply another credibility question to be resolved by the jury.

**11** The government contends that the Appellants were not entitled to an entrapment instruction. However, because the government did not oppose the Appellants' request for an entrapment instruction at trial and the instruction was in fact given, we believe it proper to consider the Appellants' challenges to the entrapment instruction.

(1)

The Appellants first contend that the district court erred by rejecting their proposed predisposition charge. To determine whether the district court's failure to give the requested charge is reversible error, we must determine whether the instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995) (internal quotation marks omitted).

The instruction requested by the Appellants stated that, for the government to carry its burden of proving predisposition, "the Government must prove beyond a reasonable doubt that Ms. Squillacote had a predisposition prior to the first time the Government approached her . . . . However, you may not find a predisposition based on any of Ms. Squillacote's conduct that was induced by the Government." J.A. 1579. The Appellants contend that their instruction is based on Jacobson, and that the instruction thus is a correct statement of the law.

In Jacobson, the defendant had previously ordered through the mail certain magazines depicting nude children at a time when possession of such magazines was legal. After the enactment of a federal statute criminalizing the receipt by mail of sexually explicit depictions of children, the government began targeting the defendant. After more than two years of repeated government solicitations, which involved the use of "five fictitious organizations and a bogus pen pal, to explore [the defendant's] willingness to break the new law by ordering sexually explicit photographs of children through the mail," id. at 543, the defendant finally ordered a magazine entitled "Boys Who Love Boys," which contained photographs of young boys engaging in sexual activities. The jury convicted the defendant, rejecting his entrapment defense. The conviction was affirmed by the Eighth Circuit Court of Appeals sitting en banc, which concluded that the defendant "was not entrapped as a matter of law." Id. at 547-48.

The Supreme Court, however, disagreed. The Court held that when "the Government has induced an individual to break the law and the defense of entrapment is at issue, . . . the prosecution must prove

32

beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." Id. at 548-49. Concluding that the government failed to prove that the defendant's predisposition to commit the crime was "independent and not the product of the attention that the Government had directed at [the defendant]," id. at 550, the Supreme Court reversed the defendant's conviction, see id. at 554.

Clearly, then, the first part of the Appellants' requested instruction --that the disposition to commit the crime must exist "prior to first being approached by Government agents"--is a correct statement of the law as explained in Jacobson. We do not believe, however, that the second part of the requested instruction is a correct statement of the law.

The second part of the instruction informed the jury that it could "not find a predisposition based on any of Ms. Squillacote's conduct that was induced by the Government." J.A. 1579. While Jacobson requires that the defendant's disposition to commit the crime must be "independent of the Government's acts," 503 U.S. at 554, Jacobson does not prohibit the consideration of actions occurring after the defendant was contacted by the government when determining whether the defendant was predisposed to commit the crime. See, e.g., United States v. Garcia, 182 F.3d 1165, 1169 (10th Cir.) (While Jacobson "requires that the defendant's predisposition be viewed at the time the government agent first approached the defendant, inferences about that predisposition may be drawn from events occurring after the two parties came into contact."), cert. denied, 120 S. Ct. 448 (1999); United States v. Byrd, 31 F.3d 1329, 1336 (5th Cir. 1994) ("[T]he crucial holding of Jacobson is that predisposition must be independent of government action. Evidence of the defendant's ready response to the solicitation, as well as evidence of independently motivated behavior that occurs after government solicitation begins, can be used to prove that the defendant was predisposed . . . ."); United States v. Garza-Juarez, 992 F.2d 896, 908 (9th Cir. 1993) ("[E]vidence of predisposition may arise both before the government's initial contact and during the course of dealings."); see also United States v. Jones, 976 F.2d 176, 179 (4th Cir. 1992) ("The government may meet its burden [of proving predisposition] by demonstrating the defendant's ready response to the inducement offered.").

33

Because the Appellants' requested instruction would have prevented the jury from considering Squillacote's actions occurring after being contacted by the undercover agent, actions which may properly be considered under Jacobson, the district court did not err in refusing the instruction.

Moreover, the district court's predisposition instructions were sufficient. The court instructed the jury that:

> A person is entrapped when that person has no previous disposition or willingness or intent to commit the crime charged and is induced by law enforcement officers to commit the offense.
>
> A person is not entrapped when that person has a previous disposition or willingness or intent to commit the crime charged and a law enforcement officer merely provides what appears to be a favorable opportunity to commit the offense.
>
> . . .
>
> In determining the question of entrapment, you should consider all of the evidence received in this case concerning the intentions and disposition of the defendant before encountering the law enforcement officer, as well as the nature and degree of inducement provided by the law enforcement officer.
>
> The burden is on the Government to prove beyond a reasonable doubt that the defendant had a previous disposition or willingness or intent to commit the crime charged. If the Government satisfies that burden, there is no entrapment.
>
> In other words, if the defendant was disposed to commit the crime, there can be no entrapment.

J.A. 1445-47 (emphasis added). By informing the jury that the defendants must have a "previous disposition" that existed "before encountering the law enforcement officer," the instruction given sufficiently

34

conveyed to the jury the requirement that the Appellants must have been predisposed to commit the crimes before they were contacted by the undercover agent. See United States v. Lorenzo, 43 F.3d 1303, 1306-07 (9th Cir. 1995) (finding no error in jury charge explaining that the government must prove that the defendant"has a previous intent or disposition" because the jury charge also explained that the disposition must have existed "before encountering the law enforcement officers or their agents" (internal quotation marks omitted)).**12**

(2)

The Appellants next contend that the district court erred by refusing to instruct the jury that, in order to prove predisposition, the government must prove that Squillacote was "in a position by virtue of his or her acquaintances, experience, occupation, or training to commit the offenses without the government's help or involvement." J.A. 1577. In essence, the Appellants contend that the question of predisposition includes a "positional" element--that is, a defendant is predisposed to commit a crime only if the defendant was in the position to commit the crime without assistance from the government.

_____

**12** The Appellants, however, contend that the government's first contact with Squillacote--the phony Kasrils letter--was an "approach," not an "encounter," because encounter can only mean a face-to-face meeting. Thus, the Appellants argue that by instructing the jury to consider predisposition that existed before the first encounter with the government, the jury may have concluded that Squillacote became predisposed to commit the crimes only after receiving the Kasrils letter, but still rejected the entrapment defense because the disposition arose before Squillacote met the undercover agent for the first time. While it may have been preferable for the instructions to use "approach" or"contact" rather than "encounter," we believe that the district court's instruction sufficiently directed the jury's focus to the proper time frame for determining the existence of Squillacote's predisposition, particularly since there was no dispute that the government's first contact was the Kasrils letter. See, e.g., United States v. Heater, 63 F.3d 311, 326 (4th Cir. 1995) ("We will not reverse a conviction based on improper jury instructions as long as the instructions given by the district court, as a whole, included the substance of the defendant's requested . . . charge.").

The Appellants' "positional" argument is based on the Seventh Circuit's decision in United States v. Hollingsworth, 27 F.3d 1196 (7th Cir. 1994) (en banc), in which a sharply divided court held that "[p]redisposition is not a purely mental state, the state of being willing to swallow the government's bait. It has positional as well as dispositional force." Id. at 1200. The court determined that defining predisposition only as willingness, without including an element of readiness, was inconsistent with the Supreme Court's decision in Jacobson:

> [H]ad the Court in Jacobson believed that the legal concept of predisposition is exhausted in the demonstrated willingness of the defendant to commit the crime without threats or promises by the government, then Jacobson was predisposed, in which event the Court's reversal of his conviction would be difficult to explain. The government did not offer Jacobson any inducements to buy pornographic magazines or threaten him with harm if he failed to buy them. It was not as if the government had had to badger Jacobson for 26 months in order to overcome his resistance to committing a crime. He never resisted.

Id. at 1199.

Whether predisposition includes a readiness element has yet to be considered in this circuit, although the Ninth Circuit has rejected the Hollingsworth formulation. See United States v. Thickstun, 110 F.3d 1394, 1398 (9th Cir. 1997) ("We read Jacobson not as creating a requirement of positional readiness but as applying settled entrapment law. The inference that the government's methods had persuaded an otherwise law-abiding citizen to break the law, coupled with the absence of evidence of predisposition, established entrapment as a matter of law under the existing two-part test. It was not necessary for the court to expand the entrapment defense, nor is there language in the opinion indicating that it did so.").[13] We need not, however,

_____

[13] A panel of the Fifth Circuit followed Hollingsworth and concluded that predisposition includes a positional element, see United States v. Knox, 112 F.3d 802, 807 (5th Cir. 1997), but the Fifth Circuit sitting en

36

decide whether predisposition includes a positional element because even under the Hollingsworth formulation, Squillacote clearly was in the position to commit the crimes with which she was charged.

After years of trying, Squillacote finally had a job that provided her with access to classified information and documents. She had received excellent training in the arts of espionage and she had a long relationship with a "spy-master" who was trying to find another connection interested in the services that he and his minions could provide. In addition, as evidenced by her approach of David Truong, the convicted spy, and her letter to her South African hero, Squillacote herself was actively searching for another customer for her skills. Thus, Squillacote was in the position to become an active spy even without the help of the undercover agent. To conclude otherwise would mean that a drug trafficker holding the keys to a warehouse full of cocaine is not in a position to distribute the cocaine while he is searching for a trustworthy customer, a clearly unreasonable and unrealistic conclusion. See Hollingsworth, 27 F.3d at 1200 ("The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so . . . . A public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales."). If the evidence in this case does not establish Squillacote's readiness, then we cannot imagine what would be sufficient.

(3)

The Appellants also contend that the district court erred by refusing to instruct the jury that a defendant can be entrapped through forms of inducement more subtle than outright coercion, such as persuasion or an appeal to sympathy. We find no error.

_____

banc vacated that portion of the panel opinion, see United States v. Brace, 145 F.3d 247, 250 (5th Cir. 1998) (en banc). The en banc court concluded that the question of whether predisposition included a positional element had not been raised at trial or on appeal, and the court therefore expressly declined to consider it. See id. at 261.

37

The Appellants' theory of the case was that the FBI, through its BAP report profiling Squillacote, masterfully catalogued Squillacote's every emotional and psychological vulnerability. The FBI then used this information to devise an undercover operation exploiting these weaknesses to ensure that Squillacote would fall for the undercover agent's pitch. The Appellants claim that the agent induced Squillacote into going along with his scheme by making subtle psychological appeals to which he knew Squillacote would be uniquely vulnerable. Consistent with this theory of entrapment, the Appellants requested the following instruction on entrapment:

> Entrapment occurs . . . [w]here the Government goes beyond providing an opportunity for a crime but instead induces its commission by taking advantage of the defendant through such persuasion as appealing to the defendant's political beliefs or to some other alternative, noncriminal type of motive, or by playing on defendant's personal sympathies and life experiences, or by exploiting the unique vulnerabilities of the defendant. The law of entrapment forbids the conviction of [a] person where the Government has played on the weaknesses of an innocent party and beguiled her into committing crimes which she otherwise would not have attempted had she not been induced by the Government.

J.A. 1575-76.

The district court refused to give this instruction. Instead, the court instructed the jury as follows:

> A person is entrapped when that person has no previous disposition or willingness or intent to commit the crime charged and is induced by law enforcement officers to commit the offense.
>
> . . .
>
> [It is not] entrapment . . . for the Government merely to solicit to commit a crime.

38

In determining the question of entrapment, you should consider all of the evidence received in this case concerning the intentions and disposition of the defendant before encountering the law enforcement officer, as well as the nature and the degree of the inducement provided by the law enforcement officer.

J.A. 1445-46. The court did not define inducement, nor did it give any examples of the type of conduct that could be considered inducement.

The Appellants contend that the district court, by refusing to give their requested instruction, prevented the jury from properly considering their defense because the court's instructions failed to adequately inform the jury about the different ways in which a defendant can be induced to commit a crime. See United States v. Hicks, 748 F.2d 854, 857 (4th Cir. 1984) ("[A] defendant is entitled to an instruction submitting to the jury any theory of defense for which there is a foundation in the evidence."); United States v. Miller, 658 F.2d 235, 237 (4th Cir. 1981) (The "district court's charge to the jury must be sufficiently precise to instruct the jury in the defendant's theory of defense." (internal quotation marks omitted)).

While "mild forms of persuasion" do not amount to inducement, United States v. Daniel, 3 F.3d 775, 779 (4th Cir. 1993), we agree with the Appellants that certain kinds of persuasion or appeals to sympathy can be considered inducements for purposes of an entrapment defense. See, e.g., United States v. Montanez, 105 F.3d 36, 39 (1st Cir. 1997) ("By omitting [from its entrapment instruction] any `sympathy' examples, the trial court may well have left the jury with the mistaken impression that coercion is a necessary element of entrapment and, in this case, such a misunderstanding could well have affected the outcome"); United States v. Jackson, 700 F.2d 181, 191 (5th Cir. 1983) (noting that to support an entrapment defense, "the government conduct must include an element of persuasion or mild coercion, such as . . . pleas based on need, sympathy, or friendship."). The instruction proposed by the Appellants, however, failed to explain to the jury that mild forms of persuasion cannot be considered inducement. To this extent, the Appellants' instruction was not a correct statement of the law, and the district court properly rejected it.

39

More importantly, however, we disagree with the Appellants' assertion that the instruction given by the district court was inadequate. While the instruction did not specifically state that inducement could be accomplished through "persuasion," neither did it limit inducement to coercion, which, according to the Appellants, was the thrust of the government's argument to the jury. Instead, the instruction required the jury to determine "the nature and the degree of the inducement" from all of the evidence presented at trial. J.A. 1446. The parties skillfully argued their views of the case during closing arguments, and the instruction gave the jury sufficient latitude to conclude that the government's actions amounted to inducement. Thus, the district court did not err by refusing to give the Appellants' requested instruction. See Chaudhry v. Gallerizzo, 174 F.3d 394, 408 (4th Cir.) ("The test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principle without misleading or confusing the jury."), cert. denied, 120 S. Ct. 215 (1999).

Moreover, even if we were to conclude that the district court's inducement instruction was inadequate, that conclusion would not require reversal. "[T]he principal element in the defense of entrapment [is] the defendant's predisposition to commit the crime." Russell, 411 U.S. at 433. Thus, even when the evidence clearly establishes that the government's actions induced the defendant to commit the crime, an entrapment defense fails if the defendant was predisposed to commit the crime. See Jacobson , 503 U.S. at 548-49; see also United States v. Cervante, 958 F.2d 175, 178 (7th Cir. 1992) ("The entrapment analysis ends without inquiry into government inducement if the defendant was predisposed to commit the charged conduct."); United States v. Osborne, 935 F.2d 32, 37 (4th Cir. 1991) ("[I]f the defendant's predisposition is established, the defense of entrapment may not be based on government misconduct."); see also Brace, 145 F.3d at 255 ("The Government acknowledges that it induced [the defendant] to launder money. Therefore, at issue is whether the evidence was sufficient to prove, beyond a reasonable doubt, that [the defendant] was predisposed to do so."). Thus, any error in the district court's instructions as to the government's inducement of Squillacote would be harmless if we can conclude that the jury could only have found that Squillacote was predisposed to commit the crimes with which she was charged. See United States v. Has-

40

tings, 134 F.3d 235, 241 (4th Cir. 1998) ("When, over a proper objection, a district court erroneously instructs the jury on an element of the offense, the error may be disregarded as harmless if a reviewing court can determine, beyond a reasonable doubt, that a correctly instructed jury would have reached the same conclusion."); see also United States v. Jackson, 72 F.3d 1370, 1378 (9th Cir. 1995) (concluding, under a plain error review, that a faulty entrapment instruction did not require reversal of the defendant's conviction because "the evidence virtually compels a finding that the defendant was predisposed"); United States v. Jannotti, 729 F.2d 213, 225 (3d Cir. 1984) (concluding that error in the district court's entrapment instructions did not require reversal where the government presented overwhelming proof of the defendants' predisposition). **14**

In our view, the evidence of Squillacote's predisposition can only be described as overwhelming. The government's evidence established that Squillacote's involvement with the HVA went back almost twenty years. Through her East German contacts, Squillacote learned how to determine if she was being followed and how to evade those who might be following her, how to receive and decipher sophisticated coded messages, how to use the miniature document camera, and how best to remove any "classified" markings on documents. After the fall of East Germany, when Squillacote finally had a job that gave her access to sensitive information, Squillacote herself sought out opportunities to use these skills. She contacted David Truong, a convicted spy, in the hopes of establishing a new"connection," and she sent her fan letter to Kasrils, the South African official, hoping that he would "read between the lines." That Squillacote actively sought employment as a spy is powerful evidence that she was disposed to committing espionage well before the government first contacted her.

_____

**14** The defense of entrapment "is not of a constitutional dimension." Russell, 411 U.S. at 433. Thus, as the Third Circuit noted in Jannotti, 729 F.2d at 225, it would seem that we would not be required to find any error in the district court's entrapment instructions harmless beyond a reasonable doubt, as we would with a constitutional error. See Chapman v. California, 386 U.S. 18 (1967). Nonetheless, even under the beyond-a-reasonable-doubt standard, we find any error to be harmless.

41

Squillacote's response to the government's phony Kasrils letter is also strong evidence of her predisposition. It is perhaps an understatement to say that Squillacote was ecstatic when she received the letter. When she received the letter, Squillacote called her brother to tell him about the letter. While laughing and crying, Squillacote said, "Michael, I did it. I did it Mike. All those years. All those years and I did it. I did it." J.A. 1893. To her husband Squillacote described the letter as "really, really, really, amazing," J.A. 1898. In fact, Squillacote was so excited when she received the letter that she even told her children about the impending meeting. See J.A. 1903. In another telephone conversation with her brother, Squillacote explained how proud she was that Kasrils had "read between the lines" of her letter. J.A. 1912.

Squillacote's predisposition to commit espionage is also evidenced by her statements to the undercover agent during their first meeting. In that meeting, the agent identified himself as being with the South African Intelligence Service, and he explained that "there are still operations being conducted without the full knowledge of everybody in the state, for reasons, I guess, you can well understand." J.A. 2189. Squillacote responded that "[t]his is an area that's not unfamiliar to me." J.A. 2190. Squillacote then elaborated that she had been associated with similar activities "in another kind of capacity" for many years, "so, you should understand that this is not a tabula rasa for me. I'm coming with a history." J.A. 2190. Squillacote described her covert activities as her "raison d'etre." J.A. 2212. When the undercover agent told Squillacote that he had "done some things that this government would consider to be illegal," J.A. 2238, Squillacote responded, "[b]een there," J.A. 2238, and she explained that she had "violated Federal eighteen, lots and lots." **15** J.A. 2239. In our view, these statements clearly show that Squillacote was more than willing, without any encouragement from the government, to commit espionage.

And perhaps the most compelling evidence of Squillacote's predisposition is related to the documents she passed to the undercover agent at their second meeting. The government's evidence established

_____

**15** Given the context, it is apparent that this statement is a reference to Title 18 of the United States Code, which is entitled "Crimes and Criminal Procedure."

42

that Squillacote obtained one of the documents sometime before her first meeting with the undercover agent, even though the phony Kasrils letter did not request, or even suggest, that Squillacote bring any classified materials to the meeting. And extra copies of two of the documents were found in Squillacote's home when the government executed its search warrant. Thus, even before she first met the undercover agent, Squillacote had already violated 18 U.S.C.A. § 793(b) by taking or copying classified national defense information. Clearer evidence of predisposition is difficult to imagine.

The evidence of Squillacote's predisposition was so strong that the jury could only conclude that Squillacote was predisposed to commit espionage. Therefore, even if the jury had been instructed on the actions that can be considered inducement and had concluded that the government in fact induced Squillacote to commit the crime, it still would have found Squillacote predisposed, thus making any finding of inducement legally irrelevant. See Osborne , 935 F.2d at 37 ("[I]f the defendant's predisposition is established, the defense of entrapment may not be based on government misconduct."). We therefore conclude beyond a reasonable doubt that, had the jury received a more thorough inducement charge, it still would have rejected her entrapment defense. Accordingly, any error in the district court's inducement instruction was harmless. See Hastings, 134 F.3d at 241.

(4)

The Appellants also contend that the district court erred when it gave an entrapment instruction that deviated from the charge the court had informed the parties it would give and to which the Appellants had tailored their closing arguments. We find no error.

Before closing arguments, the district court held a charge conference. As to the entrapment defense, the court stated that it "plan[ned] to simply give the Devitt and Blackmar[16] instruction on entrapment." J.A. 1344. After the court rejected the Appellants' requested entrapment instructions, some of which have already been discussed in this opinion, the Appellants stated that they "would prefer the full `92

_____

[16] See 1 Edward J. Devitt et al., Federal Jury Practice and Instructions § 19.04 (4th ed. 1992).

43

Devitt and Blackmar to the Government's proposed charge on entrapment." J.A. 1354. The court agreed to give the Devitt & Blackmar charge.

The Devitt & Blackmar entrapment instruction sought by the Appellants states, in relevant part:

> A defendant may not be convicted of this crime, however, if that person was entrapped by the government to the acts charged.

> A person is entrapped when that person has no previous intent or disposition or willingness to commit the crime charged and is induced or persuaded by law enforcement officers [or by their agents] to commit the offense.

> . . .

> In determining the question of entrapment, the jury should consider all of the evidence received in this case concerning the intentions and disposition of the defendant before encountering the law enforcement officers[or their agents] as well as the nature and the degree of the inducement or persuasion provided by the law enforcement officers [or their agents].

1 Devitt & Blackmar, § 19.04 (emphasis added).

The instructions actually given by the district court, however, were largely the government's proposed instructions, and the instructions deviated somewhat from the Devitt & Blackmar model instruction. The court did not include the introductory paragraph explaining that a defendant cannot be convicted if entrapped, and the district court did not include the words "persuaded" or "persuasion" in its charge. The Appellants contend that the district court violated Rule 30 of the Rules of Criminal Procedure when it deviated from the promised charge.

Rule 30 requires that the district court "inform counsel of its proposed action upon the requests [for specific jury instructions] prior to

44

their arguments to the jury." Fed. R. Crim. P. 30. The purpose of the rule is "to require the district court to inform the trial lawyers in a fair way what the instructions are going to be in order to allow counsel the opportunity to argue the case intelligently to the jury." United States v. Horton, 921 F.2d 540, 547 (4th Cir. 1990) (internal quotation marks omitted). A violation of Rule 30 requires reversal only if the defendant can establish actual prejudice. See id.; United States v. Burgess, 691 F.2d 1146, 1156 (4th Cir. 1982).

Although we question whether the district court in fact violated Rule 30 by failing to deliver the Devitt & Blackmar instruction verbatim, we will nonetheless assume that a violation occurred. The question, then, is whether the Appellants suffered any prejudice.

The Appellants contend they were prejudiced by the district court's deviation from the Devitt & Blackmar charge because, based on their expectation that the persuasion language would be included, they argued persuasion to the jury and invited the jury to listen for persuasion in the court's entrapment instruction.[17] The Appellants contend that the district court's failure to give the expected jury instruction damaged their credibility with the jury, and effectively bolstered the government's credibility because the entrapment instructions discussed by the government during its closing were ultimately given by the district court. We disagree.

Although counsel for Appellants did mention persuasion in closing argument, the reference to the court's impending instructions was rather general.[18] There was no explicit promise that the court would

_____

[17] The Appellants also contend that by failing to include the opening paragraph of the Devitt & Blackmar instruction, the court failed to inform the jury that entrapment was a complete defense to the charges. This argument is without merit. The district court informed the jury that entrapment was asserted as a defense and that the government bore the burden of proving beyond a reasonable doubt that the Appellants were predisposed to committing the crimes. Viewing the charge as a whole, we conclude that the district court adequately instructed the jury as to the effect of the asserted defense. See Chaudhry, 174 F.3d at 408.

[18] Counsel argued that the undercover agent "knew perfectly well that being the first to offer money and being the first to propose an operational interest is exactly the kind of persuasion, and listen for the entrapment instruction, persuasion, that the law forbids." J.A. 1425.

define persuasion, nor was there any attempt by the attorney to define persuasion for the jury. In addition, although the government's closing argument did focus primarily on whether Squillacote was coerced into committing the crimes, the government also used the word "persuasion" in its discussion of the entrapment defense. Under these circumstances, we simply cannot conclude that the district court's deviation from the Devitt & Blackmar entrapment instruction damaged the Appellants' credibility in the eyes of the jury. Moreover, since we have already concluded that the overwhelming evidence of Squillacote's predisposition rendered harmless any error in the court's inducement instruction, we fail to see how the court's deviation from the Devitt & Blackmar could have otherwise prejudiced the Appellants.

Therefore, assuming that the district court violated Rule 30, we conclude that the Appellants were not prejudiced by the violation and that a new trial is not warranted.

(5)

Finally, Appellant Stand contends that the district court erred by denying his request for a jury instruction on what is generally referred to as "derivative entrapment." We find no error.

As a general rule, the defense of entrapment is applicable only in cases where a government agent induces the commission of a crime by a defendant who was not predisposed to commit the crime. Thus, there is no defense of private entrapment; a defendant who was induced to commit a crime by a private party, without any government involvement, cannot claim that he was entrapped. See, e.g., United States v. Manzella, 791 F.2d 1263, 1269 (7th Cir. 1986) ("There is no defense of private entrapment. Private entrapment is just another term for criminal solicitation, and outside the narrow haven created by the defense of necessity or compulsion, the person who yields to the solicitation and commits the solicited crime is guilty of that crime." (citation omitted)); United States v. Burkley, 591 F.2d 903, 911 n.15 (D.C. Cir. 1978) ("Persuasion, seduction, or cajoling by a private party does not qualify as entrapment even if the defendant was not predisposed to commit the crime prior to such pressure.").

46

However, in cases where there is some involvement by government agents, some circuits permit a defendant to raise a form of the entrapment defense often referred to as derivative entrapment.[19] While this Circuit has never used the term "derivative entrapment" in a published opinion, our case law makes it clear that the defense is not available.

In United States v. Dove, 629 F.2d 325 (4th Cir. 1980), Gene Baker cooperated with the FBI to "cultivate contacts and develop information about the trafficking of stolen automobiles." Id. at 326. Baker ingratiated himself with George Hutto, and Baker and Hutto participated in several sales of stolen cars. Baker also helped Hutto steal heavy equipment by teaching Hutto how to operate the equipment and providing the means to transport the stolen equipment. Hutto negotiated two separate sales of bulldozers to David Dove and Robert Johnston, and Baker, the government agent, was present during both transactions. On appeal, Dove and Johnston contended that they were entrapped. The court quickly disposed of the argument, stating that "only the inducements of government agents . . . give rise to an entrapment defense. Dove and Johnston were induced to purchase the bulldozers by Hutto. Baker's involvement as a silent partner in the transaction does not change the essential `private entrapment' nature of this argument." Id. at 329; see also United States v. Comi, 336 F.2d 856, 859-60 (4th Cir. 1964) (rejecting entrapment defense asserted by defendant who claimed he was brought into the illegal venture by "the continued insistence and pleading" of an intermediary who was associated with a government agent, because the intermediary was not a government agent and did not know he was working with a govern-

_____

[19] The derivative entrapment defense has different formulations. In some circuits, a derivative entrapment defense may be raised only in cases where a government agent directs a private party to bring a specific person into a criminal scheme. See United States v. Washington, 106 F.3d 983, 996 (D.C. Cir. 1997) (per curiam); United States v. Murphy, 852 F.2d 1, 6 (1st Cir. 1988). Other circuits recognize a broader formulation of the defense, allowing entrapment to be asserted by a defendant who was induced to commit the crime by an intermediary who had been induced by a government agent, even if the government agent did not direct the intermediary to bring the defendant into the scheme. See Hollingsworth, 27 F.3d at 1204; United States v. Valencia, 645 F.2d 1158, 1168 (2d Cir. 1980).

47

ment agent); Crisp v. United States, 262 F.2d 68, 69 (4th Cir. 1958) (per curiam). These cases make it clear that, in the Fourth Circuit, a defendant cannot claim an entrapment defense based upon the purported inducement of a third party who is not a government agent if the third party is not aware that he is dealing with a government agent. Accord Thickstun, 110 F.3d at 1398; United States v. Martinez, 979 F.2d 1424, 1432 (10th Cir. 1992). The district court, therefore, committed no error by refusing to give the requested instruction.

B.

The Appellants also contend that the district court erred when it determined that the evidence established only a single conspiracy and thus refused to give the Appellants' requested multiple-conspiracy instruction. We disagree.

"A multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." United States v. Kennedy, 32 F.3d 876, 884 (4th Cir. 1994) (first emphasis added) (internal quotation marks omitted). "A single conspiracy exists where there is one overall agreement, or one general business venture. Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988) (citations and internal quotation marks omitted).

The government's evidence established that Squillacote, Stand, and Clark were involved in a single conspiracy to compromise information related to this country's national defense. Stand, who was recruited by Ziemer, recruited both Clark and Squillacote. Ziemer was the primary handler for Stand, Squillacote, and Clark, and the three received largely the same training and used the same methods of communicating with their East German contacts. After the collapse of East Germany, the three continued their relationships with Ziemer, which expanded to include the KGB. With the knowledge of the other conspirators, Squillacote also sought to develop new contacts with others who might be interested in what the group had to offer. Stand was aware of Squillacote's letter to Kasrils, as well as her meetings with the undercover agent. In fact, Stand helped Squillacote remove

48

the classified markings from the documents she provided to the agent. Clark was likewise aware of the letter she wrote to Kasrils, and Squillacote sought to involve Stand, Clark, and Ziemer in the operation after she was contacted by the undercover agent.

In our view, this evidence is more than sufficient to support the finding of a single conspiracy. That Squillacote, Stand, and Clark were not always aware of the others' activities is part of the standard operating procedure for those engaged in espionage and would not prevent the jury from determining that a single conspiracy existed. See United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993) ("[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."); United States v. Johnson, 54 F.3d 1150, 1154 (4th Cir. 1995) (concluding that evidence established a single conspiracy even if the members of the conspiracy did not know each other or had limited contact with each other).

While it is possible that Squillacote's South African foray could be viewed as separate from the original conspiracy, it was certainly closely related to the conspiracy charged in the indictment, a conspiracy in which the evidence overwhelmingly established the involvement of Squillacote and Stand. Therefore, because the evidence did not establish that the Appellants were involved "only in `separate conspiracies unrelated to the overall conspiracy charged in the indictment,'" Kennedy, 32 F.3d at 884, the district court properly refused to instruct the jury on multiple conspiracies. See id.[20]

_____

[20] The Appellants make much of Clark's testimony on cross-examination that he did not have an agreement with the Appellants to commit espionage, that he lost contact with the Appellants for a several years in the late 1970s and early 1980s, and that he was not involved in the South African effort. Given that Clark pleaded guilty to the charge that he conspired with the Appellants to commit espionage, it seems unlikely that the jury would have found this testimony particularly persuasive. In any event, to accept this argument would require us to consider only Clark's testimony and to ignore the other evidence tending to show the existence of a single conspiracy or multiple, but still related, conspiracies, which of course we cannot do at this stage of the proceedings.

49

Moreover, even if the evidence in this case warranted a multiple conspiracy instruction, the district court's failure to give the instruction amounts to reversible error only if the Appellants can establish that they were "prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial." Id. at 884 n.1 (internal quotation marks omitted). "In order to show actual prejudice stemming from a multiple conspiracy variance, an appellant must prove that there are so many defendants and so many separate conspiracies before the jury that the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." Id. at 883 (internal quotation marks omitted).

This case was relatively straightforward, at least as straightforward as an espionage case can ever be. It involved a small number of conspirators engaged in a limited number of illegal activities. Thus, we do not believe that there was any likelihood that the jury transferred evidence from one defendant to another defendant involved in an unrelated conspiracy. Moreover, the evidence of multiple conspiracies was so weak when compared to the evidence establishing a single conspiracy that we are convinced the jury would have convicted the Appellants on the conspiracy charge even if a multiple-conspiracy instruction had been given. See United States v. Tipton, 90 F.3d 861, 883 (4th Cir. 1996) (explaining that to find prejudice from the failure to instruct the jury on multiple conspiracies, an appellate court "would have to conclude that the evidence of multiple conspiracies was so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction."). Because the Appellants cannot show that they were prejudiced by the district court's refusal to instruct the jury on multiple conspiracies, any error must be considered harmless.

C.

Finally, the Appellants contend that the district court improperly defined "information relating to the national defense" when instructing the jury. We find no error.

The Appellants were convicted of violating 18 U.S.C.A. § 793(b) and 18 U.S.C.A. § 794(a) and (c). In relevant part, these statutes pro-

50

hibit the obtaining or copying of documents "connected with the national defense," 18 U.S.C.A. § 793(b), and conspiracies to or attempts to transmit documents or information "relating to the national defense," 18 U.S.C.A. § 794(a).

According to the Appellants, information that is available to the public can never be considered national defense information. Thus, the Appellants requested that the court instruct the jury as follows:

> The term "national defense" is a broad term which refers to the United States military and naval establishments and to all related activities of national preparedness. The information need not be classified information under security criteria as long as you determine that the information has a reasonable and direct connection with our national defense. If, however, the information is lawfully accessible to anyone willing to take pains to find, to sift, and to collate it, you may not find that the defendant is guilty under this section. <u>Only information relating to our national defense which is not available to the public at the time of the claimed violation falls within the prohibition of this section</u> .

J.A. 1645 (emphasis added).

The district court, however, refused to give the Appellants' instruction, and instead gave the instruction requested by the government. That instruction stated, in pertinent part, that the government

> must prove that the material is closely held by the United States government.
>
> Where the information has been made public by the United States government and is found in sources . .. lawfully available to the general public, it does not relate to the national defense.
>
> Similarly, where sources of information are lawfully available to the public and the United States government has made no effort to guard such information, the information itself does not relate to the national defense.

51

J.A. 1435.

The Appellants contend that the district court's instructions improperly hinge the national defense determination solely on the government's actions. The Appellants argue that the proper inquiry is whether the information is available to the general public, regardless of who made the information available. The Appellants presented evidence of the public availability of information similar to some of the information contained in the documents passed by Squillacote to the undercover agent. Thus, if the Appellants are correct, the instruction given by the district court would have prevented the jury from properly considering this evidence.

The government, however, contends that the district court's instruction was correct. According to the government, an espionage conviction can be based upon the transmission of information closely held by the government, even if some form of that information is available to the public, perhaps as the result of an unreliable "leak." The government points out that the Appellants were convicted of attempting to transmit national defense documents, rather than just national defense information. According to the government, official government documents carry with them an imprimatur of legitimacy and authenticity. Thus, even if speculative information similar to that contained in a document appears in the press, that should not prevent a conviction based upon the unauthorized release of the document itself. The government therefore contends that the district court properly instructed the jury that closely held information must be made available to the public by the government before it loses its status as national defense information.

The statutes at issue unfortunately provide no guidance on the question of what kind of information may be considered related to or connected with the national defense. The task of defining "national defense" information thus has been left to the courts.

The Supreme Court considered the possible limitations on national defense information in Gorin v. United States , 312 U.S. 19 (1941). Gorin involved sections one and two of the Espionage Act of 1917, the predecessor to the statutes at issue here. The defendants in Gorin argued that national defense information under the Espionage Act

52

must be limited to information related to the places and things specified in section 1(a) of the Espionage Act.[21] According to the Gorin defendants, failure to so limit the Act rendered it unconstitutionally vague and infringed "upon the traditional freedom of discussion of matters connected with national defense which is permitted in this country." Id. at 23.

The Supreme Court rejected this argument, and adopted the government's definition of national defense as "a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." Id. at 28. The Court concluded that the Act's requirement that the information be intended to be "used to the injury of the United States, or to the advantage of any foreign nation" provided a sufficient limitation on the reach of the Act:

> This [language] requires those prosecuted to have acted in bad faith. The sanctions apply only when scienter is established. Where there is no occasion for secrecy, as with reports relating to national defense, published by authority of Congress or the military departments, there can, of course, in all likelihood be no reasonable intent to give an advantage to a foreign government.

Id. (emphasis added).

In United States v. Heine, 151 F.2d 813 (2nd Cir. 1945), the Second Circuit further considered the question of whether an espionage conviction can be based upon the dissemination of publicly-available

_____

**21** Section 1(a) of the Espionage Act prohibited entering into, flying over, or "otherwise obtain[ing] information concerning any vessel, aircraft, work of defense, navy yard, naval station, submarine base, coaling station, fort, battery, torpedo station, dockyard, canal, railroad, arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, or other place connected with the national defense," if those actions were for the purpose of obtaining national defense information intended to be used "to the injury of the United States, or to the advantage of any foreign nation." Gorin, 312 U.S. at 21 n.1. Section 793(a) contains essentially identical language.

information. In Heine, the defendant, during the early stages of World War II, provided a German corporation with reports about the aviation industry in the United States. All of the information provided by the defendant "came from sources that were lawfully accessible to anyone who was willing to take the pains to find, sift and collate it." Id. at 815. Relying on Gorin, the court concluded that the dissemination of information that the government had never kept secret could not support an espionage conviction:

> [I]t is obviously lawful to transmit any information about weapons and munitions of war which the services had themselves made public; and if that be true, we can see no warrant for making a distinction between such information, and information which the services have never thought it necessary to withhold at all. There can, for example, be no rational difference between information about a factory which is turning out bombers, and to which the army allows access to all comers, and information about the same bombers, contained in an official report, or procured by a magazine through interviews with officers. The services must be trusted to determine what information may be broadcast without prejudice to the "national defense," and their consent to its dissemination is as much evidenced by what they do not seek to suppress, as by what they utter. . . . "Information relating to the national defense," whatever else it means, cannot therefore include that kind of information, and so far as Heine's reports contained it, they were not within the section.

Id. at 816. The court, therefore, reversed the defendant's conviction on the espionage count. Id. at 817.

Thus, under Gorin and Heine, the central issue is the secrecy of the information, which is determined by the government's actions. See Gorin, 312 U.S. at 28; Heine, 151 F.2d at 816. Under this analysis, the instructions given by the district court in this case were clearly correct, and properly focused the jury's attention on the actions of the government when determining whether the documents were related to the national defense. The Appellants contend, however, that cases from this Circuit have further restricted the definition of national

54

defense information, thus rendering the instruction given by the district court insufficient.

In United States v. Dedeyan, 584 F.2d 36 (4th Cir. 1978), the defendant was convicted under 18 U.S.C.A. § 793(f)(2) of failing to report the abstraction (by photographing) of a classified document related to the national defense. On appeal, this Court rejected the defendant's contention that section 793 was overbroad and thus violated the First and Fourteenth Amendments. Id. at 39. The Court concluded that any overbreadth problem was cured by the district court's jury instructions, which provided that

> "Information about weapons, munitions of war and intelligence which has been made public by Congress or the Department of Defense and is found in sources lawfully available to the general public does not relate to the national defense.

> "Similarly, where the sources of information are lawfully available to the public, and the United States and the Department of Defense have made no effort to guard such information, the information itself does not relate to the national defense."

Id. at 39-40 (emphasis added).

Clearly, the instruction given in this case is completely consistent with the above-quoted instruction given in Dedeyan. However, the quoted portions of the Dedeyan instructions are not complete, as this Court noted in Dedeyan when it stated that the district court also "stated the proposition conversely." Id. at 40. Although our opinion in Dedeyan does not include the conversely-stated portion of the instruction, the Appellants appended to their Reply Brief that portion of the transcript of Dedeyan's trial containing the relevant instructions. The portion of the charge omitted from our opinion in Dedeyan explains to the jury when information can be considered "available to the public":

> [I]f information appears in an official government document that is closely held and on its face represents the

55

> United States' own estimates of its strength and weaknesses and its intelligence as to a potential enemy's strengths and weaknesses, and such official estimates are not lawfully available to the public, the document is a source not available to the public.

Although the Appellants believe this portion of the instruction supports their position, we conclude that it instead demonstrates the correctness of the district court's instruction.

As this instruction makes clear, there is a special significance to our government's own official estimates of its strengths and weaknesses, or those of a potential enemy. When those estimates are included in an official document closely held by the government, those estimates carry with them the government's implicit stamp of correctness and accuracy. That our government believes the estimates to be correct in and of itself is a fact that would be highly valuable to other countries. While general, unofficial information about the same issues may be available in public sources, that information is merely speculative, and is no substitute for the government's official estimates. As the instruction in Dedeyan makes clear, a document containing official government information relating to the national defense will not be considered available to the public (and therefore no longer national defense information) until the official information in that document is lawfully available. Thus, as the government argues, mere leaks of classified information are insufficient to prevent prosecution for the transmission of a classified document that is the official source of the leaked information.

Such an approach to cases involving the compromise of documents is consistent with the Supreme Court's decision in Gorin, in which the Court concluded that the required level of scienter could not be established in cases "[w]here there is no occasion for secrecy." Gorin, 312 U.S. at 28. The approach is likewise consistent with the Second Circuit's analysis in Heine. See 151 F.2d at 816. And contrary to the Appellants' contention, the approach is likewise consistent with subsequent cases from this Circuit.

In United States v. Truong Dinh Hung, 629 F.2d 908 (4th Cir. 1980),[22]

_____

[22] It appears that the defendant in Truong is the David Truong approached by Squillacote in her efforts to make a new "connection."

56

this court rejected the defendants' arguments that the information at issue in that case did not relate to national defense. See id. at 918. In a footnote, the court noted that the district court properly instructed the jury that "transmission of publicly available information did not fall within the statutory prohibitions," id. at 918 n.9, a proposition established in Gorin, Heine, and Dedeyan.

Truong, however, contains no discussion of the central issue here --that is, when can information contained in a closely-held document be considered publicly available--and it does not stand for the broad proposition urged by the Appellants that the presence in the public domain of snippets of unattributed and unverified information similar to that contained in official documents closely held by the government prevents a prosecution based on the transmission of the document itself.

To accept the Appellants' argument would effectively require the government to prove, at least as to some piece of information contained in the document, that no person anywhere in the world had ever publicly speculated about that information. Requiring that kind of "proof of a negative" would unduly hamper the government's ability to protect sensitive information and would render successful prosecutions in cases involving closely-held documents nearly impossible. Cf. United States v. Richardson, 30 M.J. 1239, 1244 (A.C.M.R. 1990) (per curiam) ("The appellant contends that evidence of record is insufficient to support his espionage conviction because there is no evidence of record that the information he conveyed to `Vladimir' was not accessible to the public . . . . Contrary to the appellant's interpretation of the dicta in Gorin and the decision in Heine, the offense of espionage does not require proof of a negative averment. These decisions stand for the simple proposition that an inference of bad faith on the part of the accused may not be justified where the `national defense information' alleged in the charge is generally accessible to the public or has been published to the public at large by the United States government."), rev'd on other grounds, 33 M.J. 127 (C.M.A. 1991). The mere fact that similar but unofficial information is publicly available does not automatically remove information in closely-held documents from the realm of "national defense" information, as the Appellants' requested instruction suggests. Truong's shorthand summary of the instruction given in that case simply cannot

57

be read as silently but yet so fundamentally changing the law as established in Gorin, Heine, and Dedeyan.

We reject the Appellants' reliance on United States v. Morison, 844 F.2d 1057 (4th Cir. 1988), for the same reason. In Morison, the defendant again challenged section 793 as unconstitutionally vague. This court again rejected that argument, concluding that the jury instructions defining wilfulness and national defense information were sufficient to overcome any vagueness problem. See id. at 1071-72. The national defense instruction given in Morison stated, in relevant part, that "the government must prove that the documents or the photographs are closely held in that [they] . . . have not been made public and are not available to the general public." Id. (ellipses and alteration in original). This instruction is consistent with Gorin, Heine, and Dedeyan in that it explains that information made public by the government as well as information never protected by the government is not national defense information. While the "not available to the general public" language of the charge could arguably provide some support for the Appellants' argument, we again decline to interpret this brief reference to the jury charge as silently working a fundamental change in the law.

Here, the district court instructed the jury that the information made public by the government could not be considered national defense information, nor could publicly available information that the government has never protected. These instructions were consistent with the teachings of Gorin, Heine, and Dedeyan. Although the court did not give the additional Dedeyan instruction (which was not set out in this Court's opinion in Dedeyan), that instruction was not requested by either party, and its omission does not render improper the instructions given. We therefore reject the Appellants' challenge to the district court's national defense instructions.[23]

_____

[23] As previously discussed, the Supreme Court in Gorin concluded that the Espionage Act's scienter requirement sufficiently limited the reach of the Act so as to overcome the defendant's vagueness challenge. However, Dedeyan, Truong, and Morison focused on the jury instructions defining national defense information when rejecting the vagueness or overbreadth challenges, even though the Supreme Court in Gorin found no reversible error in the much more general national defense instructions that were given in that case. See Gorin, 312 U.S. at 30-31. To this extent, Dedeyan, Truong, and Morison arguably offer more protection to defendants than required by Gorin.

V.

After carefully reviewing the record and considering the arguments of the parties, we find no reversible error in the proceedings below. Accordingly, the convictions of the Appellants are hereby affirmed.

AFFIRMED